**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

PATRICIA LANMAN,

        Plaintiff,

v.                                    Case No. 04-00122

ROBERT HINSON et al.,

        Defendants.

_____/

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

     Pending before the court is Defendants' "Motion for Summary Judgment," filed on August 5, 2005.  The matter has been fully briefed, and the court conducted a hearing on the motion on May 24, 2006.  For the reasons stated below, the court will deny the motion.

## I. INTRODUCTION

     On February 20, 2004, Plaintiff Patricia Lanman, personal representative of the estate of Eugene H. Lanman, initiated this action asserting various causes of action related to the death of Eugene Lanman (the "decedent") while admitted at the Kalamazoo Psychiatric Hospital.[1]  Plaintiff's complaint was amended on February 27, 2004, and asserted four counts against Defendants:[2] Count I, Breach of Federal Statutory Protection Obligation Under 42 U.S.C. § 10801; Count II, Federal Statutory

_____

     [1] This case, initially assigned to Hon. David W. McKeague, was reassigned to this court on September 8, 2005 pursuant an Administrative Order.

     [2]The named Defendants are Robert Hinson; James Siegfried; Mike Morey; Linda Shaffer-Price; George White; Julie Stiver, R.N.; Edwina Koehn-Koldenhof R.N.; Jean Prandine and Steven Bronsink.

Civil Rights Violation Under 42 U.S.C. § 1983 Against the Individual Defendants; Count III, Statutory Abuse and/or Neglect in Violation of State Law, Under Mich. Comp. Laws § 330.1722; and Count IV, Assault and Battery by Individual Defendants.  Count I of Plaintiff's Amended Complaint was dismissed by stipulation on June 7, 2005.

In her Amended Complaint, Plaintiff seeks damages as a result of an altercation, which occurred on January 6, 2006, between the decedent and Defendants. Specifically, Plaintiff alleges that the decedent died as a result of physiological damage caused by Defendants when they restrained him with physical force and medication.

## II.  BACKGROUND

### A.  Admission to Kalamazoo Psychiatric Hospital

On January 5, 2002, the decedent was examined in the emergency room of Kalkaska Memorial Hospital by the Antrim/Kalkaska County Community Mental Health Department.  (Kalkaska County Sheriff Records, Defs.' Ex. 3 at 2.)  The decedent's medical chart from January 5 includes the following notations: "pt states he thinks his life is pointless -- pt states he would hurt himself -- pt unable to sleep -- pt has (2) diff. shoes on -- wife states suicidal that pt was taking a lot of meds -- neither know the meds -- pt seen at several VA clinics . . ."  (Kalkaska Memorial Health Center Records, Defs.' Ex. 1 at 6.)  The decedent was then transferred to Kalamazoo Psychiatric Hospital ("KPH") by the Kalkaska Sheriff's Office.[3]  (Def.'s Ex. 3 at 5.)

The decedent signed an "Adult Formal Voluntary Admission Application," pursuant to which he was voluntarily admitted to KPH around 10:00 p.m. on January 5,

_____

[3]Plaintiff refers to KPH as a defendant, but it is not listed on the complaint or amended complaint as such.  Plaintiff's complaint lists only individual defendants.

2002.  (Voluntary Admission Application, Pl.'s Ex. 1; Kalamazoo Psychiatric Hospital

Death Summary, Pl.'s Ex. 8.)  The form indicated that "the hospital may continue to hold

[the decedent] for a period of up to 3 days, excluding Sundays and holidays, after [he]

give[s] written notice of [his] intention to leave the hospital."  (Pl.'s Ex. 1.)

The decedent, who had never before been a patient at KPH, was evaluated by

the on-call psychiatrist, Dr. Sarat Kondapaneni.  After conducting a psychiatric

evaluation and a brief physical examination, Dr. Kondapaneni prescribed Celebrex for

the decedent's back pain and Vasotec for his blood pressure.  (Kondapaneni Dep. at

24-25, Defs.' Ex. 4.)  Dr. Kondapaneni did not prescribe any psychotropic drugs pending

receipt of further information.  (*Id.* at 25.)  Indeed, there is no material dispute that the

decedent was not given any psychiatric treatment during the time he was at KPH.  (*Id.*;

Pl.'s Ex. 8 at 23.)  The decedent was next taken to the Admissions Unit where he was

further interviewed and assessed by the Psychiatric Nurse Manager, Barbara Ann

DeKam.  (DeKam Dep. at 14; Defs.' Ex. 5.)  Ms. DeKam dispensed the Celebrex and

the Vasotec to the decedent.  (*Id.* at 44.)  KPH did not assign the decedent a bedroom

because, according to Ms. DeKam, patient rooms are not assigned on night shifts,

especially if the patient is upset or uncooperative.  (*Id.* at 46.)  Instead, such patients are

placed for observation in "quiet rooms,"[4] which apparently have fewer stimuli than

patient bedrooms.  (*Id.*)

There does not appear to be any dispute regarding the events leading up to the

decedent's struggle with Defendants.  When the decedent arrived at KPH, he was

---

[4]According to another patient, the quiet room is an empty room which sometimes
contains a mattress.  (Hunter Dep. at 15, 31; Pl.'s Ex. 16.)

3

"lethargic, mute, [and] mostly unresponsive."  (Pl.'s Ex. 3.)  Although he was

ambulatory, he was also using a wheelchair "at times" because his legs were "shaking

so badly."  (Pl.'s Exs. 3 & 4.)  The decedent stayed in the Admissions Unit for

approximately twelve hours.  (Pl.'s Ex. 8 at 22.)  KPH's "Death Summary" explains the

events leading up to the decedent's death as follows:

> After his admission this patient was quiet and calm, but later during the
> middle of the night, he became restless and agitated, and he was agitated
> initially in the morning.  He was sitting in the quiet room in the morning of
> 1/6/02, staring and not answering when addressed by staff.  At 0930 hrs.
> in the morning of 1/6/02 staff was notified that Mr. Lanman was becoming
> increasingly more agitated, going into peers' rooms and refusing to leave;
> also, he was hitting his head on the doors.  Staff attempted to redirect Mr.
> Lanman and talked to him in an effort to calm him, but his behavior
> continued.  The on-call doctor was notified of the situation and consumer's
> behavior, and we ordered Ativan 2 mg IM for agitation at that time.  The E-
> Z alarm was activated, and he was lying on the floor on his side with his
> arms flexed.

(Pl.'s Ex. 8 at 23.)

## B.  The Altercation

Defendants Mike Morey, James Siegfried, Robert Hinson, George White, Linda

Price, Jean Prandine and Steven Bronsink are all resident care aides ("RCAs") and

began work the morning of January 6, 2002 at 6:30 a.m.  (Defs.' Mot. Br. at 4.)

According to Defendant Prandine, RCAs generally try to "maintain [a] safe environment

for the patients and report their needs, if necessary, to RNs, and help them with their

daily living type things, laundry, bathing, that sort of thing."  (Prandine Dep. at 5, Defs.'

Ex. 10.)  Defendant RCAs Siegfried, Morey, Price and Prandine were assigned to the

Admissions Unit on the morning of January 6, 2002.  (Defs.' Mot. Br. at 4.)

4

Defendants Julie Stiver and Edwina Koehn-Koldenhof are both registered nurses who also began work on January 6, 2002 at 6:30 a.m.  (*Id.*)  Registered nurses at KPH are responsible for "medication/education, medication/administration, documentation [and patient] assessments."  (Koehn-Koldenhof Dep. at 5-6, Defs.' Ex. 7.)

There is no dispute that each of the individual Defendants were involved, in one way or another, in the altercation with the decedent.  There does not appear to be any dispute that the altercation began when the decedent became more and more irritable until he eventually attacked or physically threatened Defendant Mike Morey.  Defendant Morey, along with the remaining Defendants, responded to the decedent's behavior by restraining him, face down, as each of them held down a portion of his body.  The parties dispute, however, the reasonableness of the decedent's continued restraint, and also the manner in which the decedent was restrained.

Plaintiff relies primarily on the testimony of Richard P. Hunter, a patient at KPH, to describe the altercation.[5]  Mr. Hunter was in a chair or a bench about five feet from where the altercation took place.  (Hunter Dep. at 13, 31, Pl.'s Ex. 16.)  Mr. Hunter testified that he saw at least six persons holding the decedent face down on the floor of the hospital.[6]  (*Id.* at 10.)   According to Mr. Hunter, one of the staff persons was using

---

[5] Mr. Hunter stated that he believed he was taking his psychotropic medications at the time of the altercation as well as at the time of his deposition.  He is no longer a patient at any psychiatric hospital.  (Hunter Dep. at 5, Pl.'s Ex. 16.)  There is no assertion that Mr. Hunter is not competent to testify at trial.

[6] Much of Mr. Hunter's testimony consists of him reading an affidavit prepared by Plaintiff's counsel, which he signed shortly before the deposition began.  Although this form of providing "testimony" is more than a little unusual in form, drawing all inferences in favor of the nonmoving party, the deposition can be interpreted as more than simply reading the affidavit but also as verifying its accuracy in substance.

his weight and pressure to hold the decedent down, including a knee on the decedent's back.  (*Id.*)  Mr. Hunter initially signed an affidavit in which he stated that he witnessed another staff member with his knee on the back of the decedent's neck, (Hunter Aff. at ¶ 7, Pl.'s Ex. 17), but during his deposition he testified that he did not remember that, (Hunter Dep. at 10, Pl.'s Ex. 16).  He testified that other staff members had the decedent's ankles crossed and were pulling his feet toward the back of his head.  (*Id.* at 11.)  He further asserted that "a female nurse" gave the decedent a shot in the buttocks. (*Id.*)  According to Mr. Hunter, the decedent was having "obvious difficulty breathing," and the hospital staff members ignored the decedent's pleas for them to get off so he could breathe.  (*Id.* at 12.)  Two or three minutes later, the decedent was "noticeably more calm," and five minutes later, "he wasn't resisting at all.  He looked like he was passed out."  (*Id.*)  At that point, one of the hospital staff members noticed that the decedent wasn't breathing and the hospital staff slowly got off of him, rolled him on his back and began CPR.  (*Id.*)  Mr. Hunter did not hear any nurse telling the other staff members to get off of the decedent because he wasn't breathing.  (*Id.* at 14.)

Mr. Hunter gave a similar account to the Kalamazoo police department when they arrived at the scene.  The police report states:

> Hunter was upset and felt staff caused the problem.  Hunter advised he was in a room when he heard the emergency alarm.  He advised he stepped out into the hall and observed approx. 8 staff members holding Lanman down.  He advised Lanman was sort of on his side and was eventually rolled onto his stomach so he could be given an injection. Hunter felt Lanman could not breath[e] due to the way he was being held. He advised a staff member had a knee on either Lanman's head or neck and another staff member had a knee in his back.  Hunter advised he saw no choke holds or blows delivered.  He was not sure which staff member had knees on Lanman.

(Incident Report, Pl.'s Ex. 10 at 7-8.)

There is no dispute that the decedent stopped breathing and became unconscious while restrained.  The decedent never regained consciousness and died seventeen days later.  The parties do dispute, however, the cause of death.  Plaintiff contends that the decedent died from the consequences of "positional asphyxia" as a result of the manner of the decedent's restraint.  (Spitz Aff. at ¶¶ 3-4, Pl.'s Ex. 7.) Relying on the medical examiner's report and testimony (Death Certificate, Defs.' Ex. 14; Hunter Dep., Defs.' Ex. 15), Defendants argue that the decedent instead died from complications of doxepin toxicity, the decedent's underlying cardiovascular disease, and the extreme physical exertion expended during the altercation, (Defs.' Mot. Br. at 8).

### III.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue

7

must be material.  *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'").  A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from those facts in a manner most favorable to the nonmoving party.  *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). The court is not to weigh the evidence to determine the truth of the matter, but must determine if there is a genuine issue for trial.  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

### III.  DISCUSSION

### A.  Count I: 42 U.S.C. § 1983

### 1.  Alleged Violation of Federal Law

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate: (1) a deprivation of a right secured by the Constitution or laws of the United States; (2) caused by a person acting under color of state law; (3) occurring without due process of law.  42 U.S.C. § 1983; *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 995 (6th Cir.

1994).  In addressing an excessive force claim under § 1983, the first step is to identify the exact contours of the constitutional right alleged to have been violated.  *Graham v. Connor,* 490 U.S. 386, 394 (1989).   "The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard."  *Id.*

The parties dispute what constitutional standard is implicated by the facts of this case.  The Supreme Court has noted that in most instances, the standard applicable to allegations of excessive force "will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct."  *Id.*  To that end, Plaintiff cites cases employing the Fourth Amendment's "objective reasonableness" standard.  (*See* Pl.'s Br. at 14-15.)   While not directly citing the Fourteenth Amendment, Plaintiff invokes the contours of its protections by arguing that once admitted to a hospital, the decedent had a constitutional right to "a safe and humane living environment."  (*Id.* at 13.)

Defendants, however, assert that this case should be analyzed under a Fourteenth Amendment substantive due process standard.  (Defs.' Mot. Br. at 10.) Defendants cite *Terrance v. Northville Regional Psychiatric Hospital*, 286 F.3d 834 (6th Cir. 2002), in which the Sixth Circuit held that the Fourteenth Amendment governed the rights of persons involuntarily committed to a mental health facility.  *Id.*; *see also Youngberg v. Romeo*, 457 U.S. 307 (1982).  Defendants state that "[c]ounsel did not find a case from the Sixth Circuit discussing which amendment governs the rights of persons *voluntarily* committed to a mental health facility, but presumes it would be the

9

same, if there is constitutional protection at all."  (Defs.' Mot. Br. at 10.)

The parties' briefs provide little assistance to the court regarding which standard should apply.  Defendants' brief assumes the Fourteenth Amendment applies and Plaintiff's brief assumes that *both* the Fourth Amendment and the Fourteenth Amendment apply, but neither party directly analyzes the issue.[7]  (*See* Pl.'s Br. at 14-15; Defs.' Mot. Br. at 10.)  The court has conducted an independent review of the case law, and concludes that the Fourth Amendment's standard applies in this case.

The starting point for the court's analysis is the Supreme Court's decision in *Youngberg.*  In *Youngberg,* the Court considered for the first time "the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment to the Constitution" and held that they enjoyed "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests."  *Youngberg*, 457 U.S. at 314, 324.  Thereafter, the Sixth Circuit relied on *Youngberg* to hold that the Fourteenth Amendment protected those who are involuntarily committed to mental hospitals.  *Terrance,* 286 F.3d at 848.  The Sixth Circuit held that "[t]he involuntarily committed have greater rights regarding confinement under the Fourteenth Amendment than criminals are due under the Eighth Amendment."  *Id.*  The Sixth Circuit's holding, however, does not on its face apply to the voluntarily committed, such as the decedent, nor can *Youngberg* or *Terrance* be read as broadly applying to *all* those who are

---

[7] After the hearing, Plaintiff submitted a "Supplemental Citation of Authority . . ." [Dkt. # 52]  Even this document, however, fails to analyze the issue sufficiently.

committed, whether by their own volition or by state action. *Youngberg*, 457 U.S. at 324; *Terrance,* 286 F.3d at 848.

Indeed, the Supreme Court discussed *Youngberg* and similar cases, stating that "[t]aken together [these cases] stand only for the proposition that when the State takes a person into its custody *and holds him there against his will*, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 199-200 (1989) (emphasis added). The Court elaborated that "[t]he rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs- *e.g.,* food, clothing, shelter, medical care, and reasonable safety-it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *Id.* at 200.

Thus, contrary to Defendants' assumption, it was the involuntary nature of the individual's confinement that invoked the Fourteenth Amendment's protections in *Youngberg* and *Terrance*. *See Youngberg*, 457 U.S. at 317 ("When a person is institutionalized-and wholly dependent on the State- . . . a duty to provide certain services and care does exist, although even then a State necessarily has considerable discretion in determining the nature and scope of its responsibilities."); *Terrance*, 286 F.3d at 847-848 ("The Due Process Clause of the Fourteenth Amendment affords *incarcerated* individuals the right to adequate food, shelter, clothing and medical care." (emphasis added)). As the Supreme Court explained in *DeShaney*, "[i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's

freedom to act on his own behalf-through incarceration, institutionalization, or other similar restraint of personal liberty-which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means."  *DeShaney*, 489 U.S. at 200.

Here, there is no dispute that the decedent voluntarily committed himself to KPH by signing an "Adult Formal Voluntary Admission Application." (Pl.'s Ex. 1.)  Plaintiff argues that pursuant to this admission form, which incorporates the language of the relevant Michigan statute, the decedent was required to stay in KPH for at least three days.  (*See, eg.,* Pl.'s Br. at 13 n.5.)  This is simply not true.  The relevant language states that if the patient wishes to leave, the hospital *may* decline to release him for up to three days, or longer with a court hearing.  *See* Pl.'s Ex. 1; *see also* Mich. Comp. Laws § 330.1419.  Indeed, the pertinent Michigan law provides that "[e]xcept as is provided in section 420, a formal voluntary patient 18 years of age or over shall not be hospitalized more than 3 days, excluding Sundays and holidays, after the patient gives written notice of an intention to terminate his or her hospitalization and leave the hospital."  Mich. Comp. Laws § 330.1419(1).  While it is true that under this law KPH had the option of hospitalizing the decedent for *as long as* three days – or longer with a court order – after the decedent gave his written notice of an intention to leave KPH, there is no indication in the factual record that the decedent ever gave notice of his intent to leave, or that KPH was hospitalizing him against his wishes.  The decedent was therefore hospitalized voluntarily and theoretically free to leave at any time.  The most that can be inferred from the factual record is that, if the decedent at a later date attempted to leave the hospital, KPH *might* have temporarily prevented him from

12

leaving.  This is simply not enough to invoke the protections of the Fourteenth Amendment.  Thus, to the extent that Plaintiff asserts a cause of action for failure to provide adequate care and related claims under the Fourteenth Amendment, Plaintiff cannot proceed to trial on this claim.

It appears, however, that the gravaman of Plaintiff's § 1983 allegation is that Defendants violated the decedent's Fourth Amendment rights by positionally asphyxiating the decedent, holding him face down even after he stopped struggling and told them he could not breathe.  (*See* Pl.'s Br. at 14-15.)  As discussed above, because the decedent was not involuntarily committed to KPH, the court rejects Defendants' contention that this claim should be analyzed under the Fourteenth Amendment, rather than the Fourth Amendment standard.  (*See* Defs.' Mot. Br. at 11-12 (arguing that the Fourteenth Amendment's "shocks the conscience" standard, rather than the Fourth Amendment's "objective reasonableness" standard, should apply).)

The Supreme Court has held that "*all* claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor,* 490 U.S. 386, 395 (1989) (emphasis added).  Such claims are governed by the Fourth Amendment, rather than "the more generalized notion of 'substantive due process,'" because "the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct."  *Id.; see also Adams v. Metiva*, 31 F.3d 375, 385 (6th Cir. 1994) ("[A]ll excessive force claims should be considered under the Fourth Amendment standard.") *.*

13

The force used in effectuating a seizure is "excessive" if it is more than what is "reasonably necessary" under the circumstances. *Cox v. Treadway*, 75 F.3d 230, 235-36 (6th Cir. 1996). Determining whether the force used was reasonable "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396. Proper application of this test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The inquiry is objective. The question is whether the state official's actions are "objectively reasonable" in light of the circumstances. *Id.* at 397. Specifically, the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396; *see also Terry* v. *Ohio,* 392 U.S. 1, 20-22 (1968) (balancing the cost to the individual against the government's interests in effecting the seizure). An officer, or state official, may use deadly force where there is probable cause to believe that a "suspect poses a threat of serious physical harm, either to the officer[s] or others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case. *Saucier*, 533 U.S. 194, 205 (2001); *Graham,* 490 U.S. at 396-97. The defendant's subjective intentions, however, are irrelevant to the Fourth Amendment inquiry. *Graham,* 490 U.S. at 397. Further, in determining whether the defendant's use

14

of force was reasonable, the court should consider the moments immediately prior to the incident.  *See Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996).  Here, there does not appear to be a dispute that the decision to seize and restrain the decedent was lawful, given his violent and erratic behavior.  Nonetheless, the Fourth Amendment also prohibits the use of excessive force during a lawful seizure.  *Monday v. Oullette*, 118 F.3d 1099, 1104 (6th Cir. 1997).  To that end, the defendants effecting the seizure of the decedent were required to employ only a reasonable amount of force in doing so.  *See Graham,* 490 U.S. at 396.

In balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests the Sixth Circuit has stated "that a suspect's apparent mental state is one of the 'facts and circumstances of [the] particular case.'" *Gaddis v. Redford Twp.*, 364 F.3d 763, 775 (6th Cir. 2004) (quoting *Graham*, 490 U.S. at 396).  Further, evidence related to the severity of a plaintiff's injuries may be relevant in determining the amount of force used.  *Martin v. Heideman*, 106 F.3d 1308, 1311-12 (6th Cir. 1997) (holding that the Supreme Court's reference to the "nature and quality of the intrusion" in *Graham* must include consideration of the severity of any injury inflicted).  Where factual disputes exist as to these considerations, summary judgment is not appropriate.  *See Kain v. Nesbitt,* 156 F.3d 669, 673 (6th Cir. 1998) (abrogated on other grounds) ("[W]here the force used and the manner in which it was used is as plaintiff alleges here, the issue of reasonableness is a fact question, not a legal issue to be decided by the court."); *Santos v. Gates,* 287 F.3d 846, 855 (9th Cir. 2002) ("In light of the factual disputes regarding the amount of force used, the circumstances under which it was applied, and

15

the extent of the plaintiffs' injuries, the question is properly for the jury whether the force applied by the officers was objectively reasonable under the totality of the circumstances.").

Here, there are factual disputes that preclude summary judgment.  Drawing all inferences in favor of Plaintiff, a reasonable jury could conclude that Defendants improperly restrained the decedent in a dangerous face-down position, with pressure on his back and possibly his neck.  (*See* Siegfried Dep. at 53-55, Pl.'s Ex. 21; Pl.'s Ex. 10 at 3-4.)  A jury could also conclude that Defendants did not adequately monitor the decedent's breathing and failed to release the decedent after he began having difficulty breathing.  Indeed, under Mr. Hunter's version of the facts,  the decedent was having "obvious difficulty breathing," and the hospital staff members ignored the decedent's pleas for them to get off so he could breathe.  (Hunter Dep. at 12; Pl.'s Ex. 16.)  Two or three minutes later, the decedent was "noticeably more calm," and five minutes later, "he wasn't resisting at all.  He looked like he was passed out."  (*Id.*)  According to Mr. Hunter, it was not until that point, after the decedent had become unconscious, that one of the hospital staff members noticed that the decedent wasn't breathing and the hospital staff slowly got off of him, rolled him on his back and began CPR.  (*Id.*)  Under Hunter's version of the facts, which the court is bound to accept at this stage,[8] the court

---

[8]Defendants argue that Mr. Hunter's testimony is inherently suspect, and the court should therefore discount it.  (Defs.' Reply Br. at 3-5.)  While the court recognizes that Plaintiff at trial will no doubt be presented with interesting challenges to Hunter's testimony and his credibility, it is not the court's role on summary judgment to weigh the evidence to determine the truth of the matter.  *Sagan*, 342 F.3d at 497.

16

cannot conclude that Defendants' actions were objectively reasonable as a matter of
law.

Moreover, Plaintiff argues that Defendant Stiver was acting in a supervisory
position.  (*See* Pl.'s Br. at 11-12, 16.)  To impose personal liability in an action brought
pursuant to 42 U.S.C. § 1983, "[t]here must be a showing that the supervisor
encouraged the specific incident of misconduct or in some other way directly
participated in it."  *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).  "At a
minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly
authorized, approved or knowingly acquiesced in the unconstitutional conduct of the
offending subordinate."  *Id.* (citing *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 872-74
(6th Cir. 1982)).  According to Plaintiff, Defendant Stiver was in charge of the restraint
procedure, and did not tell the other Defendants to get off of the decedent.  (Stiver Dep.
at 41, Pl.'s Ex. 25; Hunter Dep. at 14, Pl.'s Ex. 16.)  A reasonable jury could therefore
hold Defendant Stiver liable for implicitly authorizing the allegedly unconstitutional
restraint of the decedent.

Indeed, even those Defendants who were not supervisors can be held liable for
their failure to come to the decedent's aid after he stopped breathing.  Case law in the
Sixth Circuit recognizes that there are "circumstances under which police officers can
be held liable for failure to protect a person from the use of excessive force."  *Turner v.
Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *see also Durham v. Nu'Man*, 97 F.3d 862, 866-
68 (6th Cir. 1996) (discussing duty of nurse in mental health hospital to protect patient).
Generally, "a police officer who fails to act to prevent the use of excessive force may be
held liable when (1) the officer observed or had reason to know that excessive force

17

would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner*, 119 F.3d at 429 (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).  Thus, even those Defendants who were not directly on the decedent's back could be held liable, if not for contributing to the decedent's predicament, then for failing to act when he began turning blue from lack of oxygen.

Defendants also argue that summary judgment is appropriate because they contend that there is no material dispute that the decedent's death was accidental and caused by his underlying cardiovascular disease, doxepin toxicity and extreme physical exertion.  (Defs.' Mot. Br. at 7-8.)  Plaintiff, however, disputes these contentions and has presented the affidavit of Werner U. Spitz, M.D.,[9] who avers that, after reviewing the decedent's medical records, various deposition transcripts, and the autopsy report, he has come to the conclusion that the decedent "died as a result of the consequences of positional asphyxia committed by the Defendant Hospital staff members."  (Spitz Aff. at ¶¶ 3-4, Pl.'s Ex. 7.)  Defendants argue that the affidavit of Dr. Spitz is "entirely conclusory," and consequently that it fails to meet the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  (Defs.' Reply Br. at 3.) Defendants rely on *Thomas v. City of Chattanooga,* 398 F.3d 426, 432 (6th Cir. 2005), in which the Sixth Circuit held that the plaintiff's expert's conclusory affidavit was insufficient to meet the standards of *Daubert*.  The Sixth Circuit stated:

---

[9] Dr. Spitz is an "actively practicing Board Certified Pathologist."  (Spitz Aff. at ¶ 2, Pl.'s Ex. 7.)

However, being an expert does not lessen the burden one has in rebutting a motion for summary judgment.  In fact "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached . . .  and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"  *See* Fed. R. Evid. 702 advisory committee's note.  When *Daubert* was remanded back to the Ninth Circuit, the court stated that "[w]e've been presented with only the experts' qualifications, their conclusions and their assurances of reliability.  Under *Daubert,* that's not enough."  *Daubert,* 43 F.3d 1311, 1319 (9th Cir. 1995).  Similarly, in this case, because Davidson's affidavits provide no rationale for his conclusions, appellants are asking that we take their expert's "word for it."  We cannot.

*Id.* at 432 (alterations in original).  Similarly here, Defendants argue that Dr. Spitz's affidavit, which indeed fails to set forth any rationale or explanations for his conclusions, is inadmissible as it fails to satisfy the standards of *Daubert.*[10]  Defendants therefore argue that the court is left with only the testimony of the medical examiner who performed the autopsy, Dr. Brian Hunter, who opines that the decedent died from complications of doxepin toxicity with extreme physical exertion compounded by his underlying cardiovascular disease.  (Defs.' Ex. 14 & 15.)

There can be no serious debate that the six-paragraph affidavit of Dr. Spitz attached to Plaintiff's response brief indeed fails to meet the *Daubert* standard.  *See Thomas*, 398 F.3d at 432.  Nonetheless, after Defendants filed their reply attacking the substance of Dr. Spitz's affidavit, Plaintiff filed an "Amended Affidavit of Werner U.

---

[10]In *Thomas*, the Sixth Circuit succinctly set forth the *Daubert* factors "which the lower courts should consider in determining the reliability of scientific evidence, including: whether the theory can be reliably tested; whether it has been subject to peer review; what the theory or test's potential rate of error of is; whether there are standards controlling the test's operations; whether the theory or test is generally accepted; and whether the expert conducted the work independent of litigation."  *Thomas,* 398 F.3d at 431 n.1.

Spitz, M.D.," in which Dr. Spitz further elaborates upon his conclusion and why Dr.

Hunter's opinion is, in his view, incorrect.  (10/21/05 "Amended Affidavit," Dkt. # 48.)

After reviewing the amended affidavit, it appears to the court that Dr. Spitz's testimony

at trial will likely meet the standards of *Daubert* and will therefore be admissible.  *See*

*Thomas,* 398 F.3d at 432.

Inasmuch as the parties agreed to waive the ordinary requirement to exchange

written expert reports under Federal Rule of Civil Procedure 26(a)(2), (*see* 6/14/04 Case

Management Order at 2), this supplemental affidavit does not violate any deadline set

forth in the court's case management order or in Rule 26.  The rule that a party may not

create a genuine issue of material fact by filing an affidavit that "essentially contradicts

his previous deposition testimony" after a motion for summary judgment has been filed,

*Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997), likewise is not

offended in this case.  Here, Plaintiff is not filing an affidavit that *contradicts* an earlier

deposition or other testimony under oath, but that merely *expands* on the witness's

opinion as set forth in a previously filed affidavit.[11]

The court finds a triable issue exists with respect to the decedent's cause of

death.[12]  Accordingly, the facts viewed in a light most favorable to Plaintiff preclude

---

[11]Moreover, neither party has submitted a deposition transcript of Dr. Spitz, despite the fact that Dr. Spitz was listed as a witness on Plaintiff's July 26, 2004 "Witness and Exhibit List."  (Dkt. # 18.)

[12]The court  is not entirely persuaded, however, that summary judgment would be appropriate even if Dr. Spitz's testimony were excluded.  Defendants argue that Dr. Hunter's testimony reveals that Defendants were not the proximate cause of the decedent's death.  Nonetheless, it is possible that a reasonable jury could conclude that the decedent's death was caused, in part, by the extreme physical exertion expended by the decedent as a result of Defendants' arguably excessive force.

summary judgment on Plaintiff's § 1983 claim that Defendants used excessive force in effecting the seizure of the decedent.

## 2. Qualified Immunity

The court is also not persuaded by Defendants' alternative argument that they are entitled to qualified immunity.  (Defs.' Mot. Br. at 15.)  In civil actions seeking money damages, "government officials acting in their official capacity are entitled to qualified immunity for discretionary acts which do not violate clearly established law of which a reasonable person would have known."  *Comstock v. McCrary*, 273 F.3d 693, 701 (6th Cir. 2001) (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity, when applicable, is not only a defense to liability, but additionally it provides immunity from suit altogether, shielding officials from the burdens of discovery and costs of trial.  *Comstock*, 273 F.3d at 701-02 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

The Sixth Circuit evaluates qualified immunity claims using a three-part inquiry. *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003); *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999).  First, the court must determine whether the plaintiff has alleged facts, which taken in a light most favorable to him, show that the defendant-official's conduct violated a constitutionally protected right.  *Toms*, 338 F.3d at 524.  Second, if the first inquiry is answered in the affirmative, the court determines whether the right that was violated was clearly established such that a reasonable official, at the time the act was committed, would have understood that his conduct violated that right.  *Id.*; *Comstock*, 273 F.3d at 702 (citing *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).  Finally, the court determines whether the plaintiff has alleged sufficient facts and supported his

allegations with sufficient evidence to indicate that what the official allegedly did was unreasonable in light of the clearly established constitutional right.  *Toms*, 338 F.3d at 524.

This examination "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Saucier*, 533 U.S. at 201.  Furthermore, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right."  *Id.* at 202 (quoting *Anderson*, 483 U.S. at 640). "The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.*; *see Wilson v. Layne,* 526 U.S. 603, 615 (1999).  It is not necessary, however, "that the very action[s] have been previously held unlawful but, given the preexisting law, the unlawfulness of the conduct must have been apparent."  *Barton v. Norrod*, 106 F.3d 1289, 1293 (6th Cir. 1997) (citation omitted).

Here, as discussed above, a reasonable jury could conclude that Defendants used excessive force in effecting the seizure of the decedent.  If the jury were to accept Plaintiff's version of the facts, the decedent's death was caused by Defendants' unlawful actions in ignoring the decedent's pleas for help and continuing to restrain him past the point of reasonable necessity.  The unlawfulness of this alleged conduct would have been apparent to a reasonable state actor.  Accordingly, although Defendants may be revealed as entitled to qualified immunity at trial, they are not so entitled at stage in the litigation. *See Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989) (holding that summary judgment and qualified immunity were precluded because excessive force claim turned entirely on which version of the facts is accepted by the jury).

22

### B.  State Law Claims

Defendants also seek summary judgment on Plaintiff's state law claims, asserted under Counts III and IV of Plaintiff's Amended Complaint.   The court is not persuaded that summary judgment should be granted on either of these claims.

### 1.  Count III, Statutory Abuse and/or Neglect in Violation of State Law

Under Count III, Plaintiff asserts that Defendants violated their statutory duties under Mich. Comp. Laws § 330.1722, which generally provides that "[a] recipient of mental health services shall not be subjected to abuse or neglect."  Mich. Comp. Laws § 330.1722(1).  Defendants make two arguments with respect to this claim.  First they argue that there is no evidence by which a reasonable jury could conclude that they abused or neglected the decedent.  (Defs.' Mot. Br. at 17.)  The court, however, has already rejected this argument in relation to Plaintiff's excessive force claim.  Based on the testimony of Dr. Spitz and Mr. Hunter, a reasonable jury could find that Defendants at least "neglected," and possibly "abused" the decedent in their efforts to restrain and subdue him.  Summary judgment is therefore not proper on this basis.

Defendants also argue, however, that even if the decedent was abused, Mich. Comp. Laws § 330.1722 does not create a private cause of action for this statutory violation.  (Defs.' Mot. Br. at 15-16.)  Defendants do not cite any authority for this proposition, and the court rejects it.  The plain language of the statute appears to allow a private cause of action exists under Mich. Comp. Laws § 330.1722(3), which states that "[a] recipient of mental health services who is abused or neglected has a right to pursue injunctive *and other appropriate civil relief.*"  *Id.* (emphasis added).

23

The court notes that is true that Michigan courts have held that § 1722 does not waive immunity against governmental units and agencies. *Dockweiler v. Wentzell,* 425 N.W.2d 468 (Mich. Ct. App.1988) ("We believe that a tort claim for damages does not constitute 'appropriate civil relief' under § 722 against the governmental unit and agency in this action because the unit and agency are entitled to the protection of governmental immunity and § 722 is not an exception to such immunity."). This holding was reiterated in *De Sanchez v. Genoves-Andrews,* 446 N.W.2d 538, 542 (Mich. Ct. App. 1989) ("We reiterate our previous holding that the state, engaged in the governmental function of providing mental health care, is immune from liability for alleged statutory abuse."). Nonetheless, in an earlier decision, the *De Sanchez* court had previously held that immunity did not shield state actors, as opposed to governmental units, from actions brought under § 1722. *De Sanchez v. Genoves-Andrews,* 410 N.W.2d 803, 811 (Mich. Ct. App. 1987). Specifically, the court held that "there is no immunity for intentional torts committed by individual employees, such as acts of abuse prohibited under § 722. Hence, because the suit for damages would otherwise be available against an individual state employee who is accused of abusing a mental patient, we find that such a suit is 'appropriate civil relief.'" *Id.* This holding was not affected by the later *De Sanchez*'s opinion which held only that a private cause of action may not be maintained against governmental agencies. *See De Sanchez*, 446 N.W.2d at 542.

Thus, the court finds that a private cause of action is sustainable against individual defendants under Mich. Comp. Laws § 330.1722, and further finds that Plaintiff has produced sufficient evidence to convince a reasonable jury that Defendants violated § 1722 in their treatment of the decedent.

24

## 2.  Count IV, Assault and Battery by Individual Defendants

Under Count IV of Plaintiff's Amended Complaint, Plaintiff asserts an "assault

and battery" claim against Defendants.  (Am. Compl. ¶¶ 72-79.)  Assault and battery are

intentional torts and the Michigan Court of Appeals described their elements in *Smith v.*

*Stolberg*, 586 N.W.2d 103 (Mich. Ct. App. 1998):

> An assault is "any intentional unlawful offer of corporal injury to another
> person by force, or force unlawfully directed toward the person of another,
> under circumstances which create a well-founded apprehension of
> imminent contact, coupled with the apparent present ability to accomplish
> the contact."  *Espinoza v. Thomas,* 189 Mich. App 110, 119, 472 N.W.2d
> 16 (1991).  This Court defined battery as "the wilful and harmful or
> offensive touching of another person which results from an act intended to
> cause such contact."  *Id.*

*Smith*, 586 N.W.2d at 105.

As a general rule, intentional torts are not protected by governmental immunity;

however, governmental actions which would normally constitute intentional torts are still

protected by immunity if those actions are justified.  *Brewer v. Perrin*, 349 N.W.2d 198,

202 (Mich. Ct. App. 1984); *VanVorous v. Burmeister,* 687 N.W.2d 132, 142 (Mich. Ct.

App. 2004).

Under Michigan law, an officer may use such force as is reasonably necessary to

effect a lawful arrest or seizure.  *Young v. Barker*, 405 N.W.2d 395, 402 (Mich. Ct. App.

1987).  If an officer uses reasonable force then his actions in making a lawful seizure

are justified.  *Id.*  On the other hand, "[w]here an officer uses excessive force, he may

be held liable for assault and battery even where the arrest is valid."  *Gaddis v. Redford*

*Tp.*, No. 242831, 2004 WL 243363, *4 (Mich. Ct. App. 2004) (citing *White v. City of*

*Vassar,* 403 N.W.2d 124 (Mich. Ct. App. 1987)).  For the reasons stated fully above,

there is a genuine issue of fact as to whether Defendants used excessive force when

subduing the decedent.  Accordingly, summary judgment on this claim is precluded.

## IV.  CONCLUSION

IT IS ORDERED that Defendants' "Motion for Summary Judgment" [Dkt. # 34] is

DENIED.

                                  S/Robert H. Cleland
                                  ROBERT H. CLELAND
                                  UNITED STATES DISTRICT JUDGE

Dated:  August 10, 2006


I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, August 10, 2006, by electronic and/or ordinary mail.

                                  S/Lisa Wagner
                                  Case Manager and Deputy Clerk
                                  (313) 234-5522